**UNITED STATES of America,**
**Plaintiff,**

v.

**REAL PROPERTY IN SANTA**
**PAULA, CALIFORNIA,**
**Defendant.**

**Case No. CV 05–08217 MMM (VBKx).**

United States District Court,
C.D. California.

Jan. 25, 2011.

lecting an exclusive forum for intra-entity disputes." *In re Revlon, Inc. Shareholders Litigation,* 990 A.2d at 960.

Frank D. Kortum, AUSA–Office of U.S. Attorney, Los Angeles, CA, for Plaintiff.

## ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

MARGARET M. MORROW, District Judge.

On November 18, 2005, the United States of America filed this action *in rem* against defendant Real Property in Santa Paula, California.[1] The complaint states a single claim for forfeiture under 21 U.S.C. § 881(a)(7).[2] On March 14, 2007, the court stayed the case pending resolution of a related criminal matter.[3] On July 28, 2010, the stay was lifted and the case reopened.[4] On December 17, 2010, plaintiff filed a motion for summary judgment.[5] Defendant opposes the motion.[6]

### I. FACTUAL BACKGROUND

The defendant property is comprised of a residential house with five or six outbuildings along the driveway leading to the house.[7] It also includes an orchard of approximately one hundred apricot trees between the house and the outbuildings,[8] and a wooded hillside that is essentially deserted and non-productive.[9] There are three water tanks located at the top of the hillside, which provide water to the residence, and three additional water tanks located halfway down the hill, at the bottom of the hill, and next to the house.[10]

In May 2005, the Ventura County Sheriff's Department received information from a citizen informant about an outdoor marijuana grow on the property.[11] The informant stated that the outdoor grow was in a makeshift building with metal siding and a white canvas cover on top, which shielded the grow from aerial view.[12] The grow was approximately ten feet in width by fifty feet in length, and was visible from the adjacent property.[13]

In August 2005, Detective Lisa Panza obtained permission to enter the neighboring property, and was able to observe the outdoor marijuana grow described by the anonymous caller.[14] Panza conducted further investigation and learned that John F. Griffiths ("Griffiths") owned the defendant property and resided there with his son, Jonathan Griffiths ("Jonathan").[15]

---

1. Complaint, Docket No. 1 (Nov. 18, 2005). The legal description of the property is: "That portion of Lot 22, of the Eliseo Tract, in the County of Ventura, State of California, as shown on map recorded in book 8, page 96, of Parcel Maps, in the Office of the County Recorder of said County, shown as parcel 10 on said map, together with those certain non-exclusive easements for road and utility purposes as described in that certain easement deed dated October 2, 1979 and recorded January 8, 1980 in book 5574, page 186 of the official records. Assessor's Parcel Number: 062–0–060–375." (*Id.*, ¶ 4.)

2. *Id.* at 1.

3. Stipulation and Order Granting Request to Stay, Docket No. 26 (Mar. 14, 2007).

4. Order to Vacate Stay of Action, Docket No. 46 (Jul. 28, 2010).

5. Motion for Summary Judgement ("Motion"), Docket No. 51 (Dec. 17, 2010).

6. Opposition to Motion for Summary Judgment ("Opposition"), Docket No. 54 (Jan. 3, 2011).

7. Opposition, Exh. 1 (Declaration of John F. Griffiths ("Griffiths Decl."), ¶ 3).

8. *Id.*, ¶ 11.

9. *Id.*, ¶ 4.

10. *Id.*, ¶ 7.

11. Motion, Exh. 1 (Declaration of Lisa Panza ("Panza Decl."), ¶ 2).

12. *Id.*

13. *Id.*

14. *Id.*, ¶ 3.

15. *Id.*

On September 1, 2005, based on the information that had been obtained, Detective Panza obtained a search warrant for the primary residence and for a modular home approximately seventy-five yards east of the residence; both structures are located on the defendant property. Prior to serving the search warrant, detectives conducted surveillance of the defendant property to confirm that marijuana plants were present.[16] A Ventura Sheriff's helicopter hovered over the defendant property for about five minutes.[17] Approximately three minutes after the helicopter left the area, Jonathan came out of the primary residence and rode an ATV to the grow site. He began to harvest the marijuana and continued to do so until he was approached and arrested by Detective Eddie Reyes.[18] During their search of the outdoor grow site, detectives seized approximately 202 mature marijuana plants.[19]

Detectives also found a sign on the outside of the makeshift dwelling that read, "Smile, you're on camera! Alarm is Sounding!"[20] and saw a closed circuit television camera security system, which appeared to be monitoring the grow site.[21] The electrical power sources for the grow site and the security system were both routed back to the primary residence.[22] In his declaration, Griffiths asserts that he installed the camera to monitor his mailboxes after neighbors reported problems with mail theft. He contends that the unit at no time worked properly after its installation in 2003,[23] and that he has never seen viewable images on the monitor.[24]

Detectives entered the primary residence and did a protective sweep to secure the area.[25] During this sweep, detectives found an indoor marijuana greenhouse in an upstairs bedroom.[26] The indoor grow room was across the hall from Griffiths' bedroom.[27]

The following items were seized from in and around the primary residence: (1) outside the residence, an alarm wire from the outdoor grow that led to the house; (2) in the living room in front of the fireplace, a television monitor that allegedly displayed the outdoor grow; (3) inside a cabinet in the living room next to the front door, a clear plastic bag containing approximately eighteen grams of processed marijuana; (4) on Griffiths' desk in his bedroom, a box of documents labeled "John Griffiths" that included two receipts from Foothill Hydroponics, a retailer of equipment and chemicals used for indoor plant growth;[28] (5) in Griffiths' bedroom, $400 in U.S. currency in a briefcase and $1,000 in U.S. currency in a floor safe; (6) six electrical ballasts, used to balance electrical fuses and make grow-lights last longer;[29] (7) in the grow room, high energy lamps with several high wattage bulbs, used to help marijuana

16. *Id.*

17. *Id.,* ¶ 5.

18. *Id.*

19. *Id.*

20. *Id.,* ¶ 6.

21. *Id.*

22. *Id.*

23. Griffiths Decl., ¶¶ 35–37.

24. Panza Decl., ¶ 9.

25. *Id.*

26. *Id.*

27. *Id.*

28. The items listed on the receipt included sulfur, a carbon dioxide filter, and a flange. They were found in a modular home that contained an indoor grow. (*Id.*)

29. Several of the ballasts were found outside the door of Griffiths' bedroom and the door of the grow room across the hall. (*Id.*)

grow;[30] (8) on the hallway floor between Griffiths' bedroom and the marijuana grow room, a carbon dioxide generator, used to oxygenate plants in an indoor grow; (9) in the indoor grow room, two electrical cycle timers that automatically turned on the lights and ventilation system; and (10) in the primary residence, two shotguns, six rifles, and three handguns.[31] Upon clearing the primary residence, Detective Panza noticed a strong odor of marijuana plants in the hallway.[32]

The modular home for which a warrant was obtained was located in front of the primary residence such that anyone going to the primary residence had to drive past the modular home.[33] In the modular home, which had four rooms, a hallway, and a bathroom, detectives found a hydroponic marijuana grow.[34] A total of 92 marijuana plants, ranging in size from three inches to four feet in height, were found throughout the modular home, except in the bathroom and living room.[35] Chemicals used for growing plants without soil were found on the floor throughout the modular home. The living room contained numerous items used for the cultivation and growth of marijuana, such as nutrients, bulbs, tubs, water, and chemicals.[36]

Indoor marijuana grow operations commonly use bright lighting from metal halide, high pressure sodium, or fluorescent bulbs.[37] The lights are used for prolonged periods and consume substantial electricity because of their high wattage.[38] Electricity at the defendant property is provided by Southern California Edison (SCE).[39] The SCE account is in Griffiths' name and lists the addresses of the primary residence and modular home. SCE records reflect that between May 15, 2004 and September 23, 2005, Griffiths' combined electrical use for the primary residence and the modular home was as follows:

| Read Date | Total Usage | Total Billed |
| --- | --- | --- |
| 05/25/04 | 3862 | $541.69 |
| 06/24/04 | 4443 | $564.81 |
| 07/23/04 | 3856 | $564.81 |
| 08/24/04 | 3116 | $457.32 |
| 09/23/04 | 2381 | $336.45 |
| 10/25/04 | 2172 | $279.69 |
| 11/24/04 | 2337 | $306.18 |
| 12/17/04 | 4297 | $619.61 |
| 1/25/05 | 4465 | $661.43 |
| 2/24/05 | 4637 | $687.16 |
| 03/26/05 | 4130 | $591.83 |
| 4/25/05 | 2732 | $367.53 |
| 5/24/05 | 2225 | $286.38 |

30. Different stages of marijuana growth require different amounts and intensities of light. (*Id.*)

31. *Id.* Griffiths contends that detectives located the firearms in, and removed them from, a gun safe. (See Griffiths Decl., ¶¶ 97–98 ("For several years my son and I have been doing skeet and target shooting. The deputies found our gun-safe which is a bolted gun-safe in the area near the living room. We usually keep it locked. My son said the deputies asked for the key and he got it for them and opened it up. We always follow safety rules").)

32. *Id.*

33. *Id.,* ¶ 10.

34. *Id.*

35. *Id.*

36. *Id.*

37. *Id.,* ¶ 11.

38. *Id.*

39. See Motion, Exh. 3 (Declaration of Frank D. Kortum ("Kortum Decl."), Exh. F (SCE account bills)).

| 6/23/05 | 2441 | $347.94 |
|---------|------|---------|
| 7/25/05 | 1170 | $275.85 |
| 8/23/05 | 3607 | 604.17 |
| 9/23/05 | 1843 | $251.66 |

During the search of the primary residence on September 1, 2005, an electrical bill bearing Griffiths' name was found in the box of documents in Griffiths' bedroom, together with the hydroponics bill and other personal papers belonging to Griffiths.[40] SCE reports that bills for normal electrical usage at houses in the same area during the same period averaged between $77.85 and $95.05 per month.[41]

Griffiths asserts that when he purchased the property, he asked why the electrical bills were so high.[42] The former owner told him that the water pumps on the property ran on electricity and that, unless disconnected, Griffiths could "expect at least a five-hundred ... a month water bill."[43] He reports that, prior to 2005, a faulty valve on one of the tanks at the top of the hill caused two pumps to operate almost continually.[44]

At his deposition, Griffiths testified that he "spent a lot of time away from the property." [45] In his declaration, Griffiths explains that he is a deep water engineer, who specializes in federal contracts for deep water vessel modifications, and that he travels frequently to the Caribbean, Louisiana, and San Francisco for work.[46] As a result, Griffiths maintains, Jonathan has, since Griffiths' purchase of the defendant property, "basically ... been taking care of" it.[47]

During discovery, however, Griffiths produced a calendar and schedule showing that he was present at the defendant property for significant periods while marijuana cultivation, which is a labor-intensive activity,[48] was underway there.[49] Plaintiff contends that, when he was present, Griffiths engaged in agricultural activities that required him to be outdoors, such as harvesting apricots in the orchards located on

40. Panza Decl., ¶ 13.

41. *Id.,* ¶ 14.

42. Griffiths Decl., ¶ 8.

43. *Id.,* ¶ 20. Griffiths states that "[d]uring escrow Mr. Larry Wertz told my son, Jonathan Griffiths[,] he had had several bills in excess of $1,000.00." (*Id.,* ¶ 21.) Griffiths thus offers a statement made to his son, which his son in turn reported to him, as evidence of the amount of the prior owner's electric bills. Although plaintiff has not objected to this evidence, the court notes that it contains two levels of hearsay and is not admissible. FED.R.EVID. 801 (defining hearsay as "a statement, other than one made by the declarant while testifying at trial or a hearing, offered ... to prove the truth of the matter asserted").

44. *Id.,* ¶¶ 24–25.

45. Kortum Decl., Exh. G (Deposition of John Griffiths ("Griffiths Depo.") at 186:2–3 ("I spend a lot of time away from the property")).

46. Griffiths Decl., ¶ 26.

47. *Id.,* ¶ 27.

48. Motion, Exh. 2 (Declaration of Joseph F. Bryson ("Bryson Decl."), ¶ 4).

49. Kortum Decl., Exh. H. In 2004, for example, Griffiths was away from the defendant property on January 20–21, February 6–8, February 13–15, March 10–11, March 19–20, April 2–4, April 21–23, April 23–25, May 14–16, June 1–4, June 11–13, June 25–27, and June 20–30, July 12–15 July 30–31, August 1, August 12–15, August 16–18m, September 22–23, September 24–26, October 4–7, October 8–10, October 15–18, October 24–27, November 12–14, November 24–28, December 1–3, December 3–13, and December 18–19. In 2005, Griffiths was away from the defendant property on January 7–9, January 15–16, January 17–21, January 28–30, February 4–6, February 7–9, February 26–27, April 11–13, April 22–24, April 28–30, May 1, May 13–15, May 28–30, June 3–5, June 6–10, June 13–14, June 24–26, June 27–29, August 4–11, August 17–19, and August 19–21. (*Id.*)

the property;[50] Griffiths disputes this, and asserts that Jonathan was primarily responsible for apricot cultivation.[51]

Griffiths is aware of his son's prior conviction for attempting to smuggle "lots of marijuana" into the United States from Canada.[52] Griffiths has smoked marijuana, but not for thirty years.[53] About two weeks before the execution of the search warrant, Griffiths noticed that Jonathan was growing plants in the room in the primary residence where the indoor grow operation was subsequently found, and that the plants were surrounded by "light fixtures." He testified that, although he could not discern whether the plants were "marijuana or a fig tree," he told Jonathan to remove the plants because he

"guess[ed]" and "had to assume" they were marijuana.[54] After telling Jonathan to remove the plants, Griffiths took no follow-up action despite his supposition that the plants were marijuana.[55]

The day after his conversation with Jonathan, Griffiths left on a trip to San Francisco; upon his return, he checked Jonathan's bedroom and the plants were gone, although some electrical "stuff still appeared to be out in the hallway on the floor." [56]

■ Between 2002 and August 2005, Griffiths consistently made cash deposits to CBC Federal Credit Union account that averaged $2,000 per month; at his deposition, Griffiths could not recall the source of many of the deposits.[57] Griffiths explained

---

50. Motion at 5.

51. Griffiths Decl., ¶¶ 27–28.

52. Griffiths Depo. at 33:13–34:11 ("Q: What do you know about your son being arrested in Idaho? A: He had been stopped coming across the border from Canada to the U.S. in Idaho with marijuana ... Q: Was your son convicted in connection with that arrest? A: I think that would be called a conviction. He had to do restitution.... Q: What did Jonathan tell you about what he was doing with the narcotics in Idaho at that time? A: They went up there on a trip with some guys and found out, gee, they can buy marijuana there cheaper I think was the deal. And he just bought lots of marijuana to bring back").

53. Id. at 32:3–4 ("Q: Have you ever used marijuana? A: Not in the last 30 years").

54. Id. at 29:3–30–14 ("Q: And did you go into [Jonathan's room] in 2005? Before September 1, 2005? A: I did. Q: Did you see signs of marijuana being grown in that room? A: ... I came back [from a trip] and went into the room and noticed there was stuff growing there. I couldn't tell you whether it was marijuana or a fig tree. But there were plants growing in that room. And he had light fixtures up and stuff like that. And I said get it the hell out of there.... Q: And why did you tell Jonathan to get it out? A: Because it didn't belong there.... Q: Did you know that he was growing marijuana in that room? A: I did not know that, and I don't

know that that was marijuana growing in there. I can guess. I can certainly guess. But did I know? No. Absolutely [not]"); Griffiths Decl., ¶ 64 ("Within the house, approximately a week and a half prior to the appearance of the law enforcement authorities with the Search Warrant, I happened to go down the hallway from my bedroom to my son's room and discovered electric lights, a large canopy and underneath some small plants which I had to assume were marijuana").

55. Motion at 6.

56. Griffiths Decl., ¶ 72.

57. See, e.g., id. at 36:20–38:19 ("Q: Do you recall depositing a thousand dollars in cash in May of 2002? A: Not specifically. Q: Do you have any recollection where this cash came from? A: A thousand dollars, I wouldn't know. Just as a side, for instance, my daughter had given me a thousand dollars for a boat that we sold ... I don't remember back in 2002 exactly what may have happened. But I mean, I hope one's memory is not supposed to be that good. I just can't remember that far back those things. Q: Just if you remember ... Do you recall depositing a thousand dollars in cash in July of 2002? A: Not specifically. Q: You have no specific recollection where this money may have come from? A: Not specifically, no ... Q: Do you recall depositing $1,800 in cash in August of

that he derived income in part from selling cars and other vehicles, and in part from renting the modular home on the defendant property.[58] In his declaration, Griffiths explains that, some time before he was deposed in the instant matter, he was involved in a volatile and contentious divorce;[59] in that context, his divorce attorney advised him that he should respond to cross examination questions at depositions by "provid[ing] no answer that [he] was not precisely confident with as to any given question."[60] During his deposition in the instant matter, Griffiths followed those instructions precisely;[61] therefore, when individual bank slips were presented to him, which he had not seen in years, he "followed the instructions of [his] prior attorney and stated 'I don't know' because in fact at that precise moment [he] didn't know the circumstances of each apparent document of activity."[62]

In his declaration, Griffiths states that he never saw any plants that looked liked

---

2002? A: Not specifically. Q: You have no recollection where $1,800 in cash may have come from that was deposited into your account in August 2002? A: No ... Q: Also, in August of 2002, on a later date—this would be August 21 of 2002, $2,000 in cash was deposited into your account. Do you have any recollection where that cash came from? A: Not specifically. Q: So you deposit $3,800 in cash into your account in August of 2002, but you don't recall where that cash came from? A: That's correct").

58. *Id.* at 36:1–12 ("Q: Where would that cash have come from? A: It would have come from sale of vehicles, the income from the ... modular home. Q: Anything else?. So you have no specific recollection where you received $3,000 in cash in April of 2002? A: It could very well have been three months from the modular. I mean I wouldn't necessarily deposit that every month"). See also, Griffiths Decl., ¶ 31 ("When I was at home ... I was involved in [the] restoration of early Sports Cars"), ¶¶ 29–30 ("During this time period two of [Jonathan's] friends who were willing to pay rent moved into the unoccupied modular house located near the driveway of the property. I never knew their names, but they did pay cash rent while they were living there").

59. Griffiths Decl., ¶ 47.

60. *Id.*, ¶¶ 46–47.

61. *Id.*, ¶ 49.

62. *Id.*, ¶ 53. Griffiths has since offered to the U.S. Attorney's Office to retake his deposition but his offer has not been accepted. (*Id.*, ¶ 62.) In its reply, plaintiff suggests that the paragraphs of Griffiths' declaration that explain his deposition testimony constitute a sham affidavit. (Reply Memorandum, Docket No. 58 (Jan. 10, 2011), 8.) Where a party opposing summary judgment submits a declaration that contradicts or seeks to explain earlier deposition testimony, the court must make a factual determination as to whether the declaration is an attempt to create a "sham" issue of fact and avoid summary judgment. If it makes such a finding, the declaration cannot be considered in ruling on the opposing party's motion. *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266–67 (9th Cir.1991) (limiting the rule first articulated in *Radobenko v. Automated Equip. Corp.*, 520 F.2d 540, 543–44 (9th Cir.1975)). An affidavit is not a sham if: (1) it "merely elaborat[es] upon, explain[s] or clarif[ies] prior testimony," *Messick v. Horizon Industries, Inc.*, 62 F.3d 1227, 1231 (9th Cir.1995); (2) if "the witness was confused at that time of the earlier testimony and provides an explanation for the confusion," *Pacific Ins. Co. v. Kent*, 120 F.Supp.2d 1205, 1213 (C.D.Cal.2000) (citing *Kennedy*, 952 F.2d at 266); or (3) if the declaration concerns newly discovered evidence, *id.* Griffiths' declaration does not contradict any statements made during his deposition; rather, Griffiths explains why he answered "I don't know" in response to questions about specific bank statements which he had not seen for years prior to his deposition; significantly, Griffiths states in his declaration, as he did during his deposition, that "at that precise moment I didn't know the circumstances of each apparent document of activity." (Griffiths Decl., ¶ 53.) His testimony is therefore consistent, rather than contradictory. Accordingly, Griffiths' declaration is not a sham affidavit and can be considered for purposes of deciding plaintiff's motion.

marijuana plants growing anywhere on the acreage;[63] that he "had no reason to check[ ] out what was going on with the renters in the modular house;"[64] that he never noticed "a[ ] peculiar odor that would have alerted [him] to strange things growing";[65] and that he knew that his son had periodically smoked marijuana for pain, but had no knowledge that he had ever smoked in the house.[66]

Jonathan has submitted a declaration stating that he was primarily responsible for the care and upkeep of the defendant property.[67] Initially, he experimented with growing marijuana in an abandoned sheep pen on the defendant property.[68] At some point, he learned that renters in the modular home were also growing marijuana.[69] Jonathan asserts that he "kept everything quiet," and that "[t]here was nothing showing ... [that] anything was being done illegally anywhere on the property."[70] As for the receipts for hydroponic chemicals seized from the primary residence, which bore the name "John Griffiths," Jonathan asserts that this is the name he has "always" used "going ... through school an[d] even today."[71] Jonathan asserts he has "no reason to believe [his] father ever specifically saw the receipt for the hydroponics items; [that Griffiths] never ever mentioned it to [Jonathan] and [that Jonathan] of course never mentioned it to [Griffiths]."[72] Jonathan also asserts that he "had no reason

to believe [his] father was aware of any illegal activity on the property at all."[73]

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided

63. *Id.,* ¶ 84.

64. *Id.,* ¶ 83.

65. *Id.,* ¶ 85.

66. *Id.,* ¶ 89. Jonathan has a doctor's prescription for the use of medical marijuana and began using marijuana for pain relief following a cervical disc injury. (Declaration of Jonathan E. Griffiths ("Jonathan Decl."), ¶¶ 10, 12–13).

67. *Id.,* ¶¶ 4–5.

68. *Id.,* ¶ 15.

69. *Id.,* ¶ 19.

70. *Id.,* ¶ 20.

71. *Id.,* ¶¶ 23–24, 26.

72. *Id.,* ¶ 29.

73. *Id.,* ¶ 41.

in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); FED. R. CIV. PROC. 56(e).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED. R. CIV. PROC. 56(e). Conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985); *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979).

### B. Legal Standard Governing Civil Asset Forfeiture Actions

■ To prevail in an action under 21 U.S.C. § 881(a)(7), the government must prove by a preponderance of the evidence that the property is subject to forfeiture. See 18 U.S.C. § 983(c)(1) ("In a suit or action brought under any civil forfeiture statute for the civil forfeiture of any property ... the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture"); see also *United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1116 (9th Cir.2004) (noting that the Civil Asset Forfeiture Reform Act ("CAFRA") raised the government's burden of proof from probable cause to a preponderance of the evidence); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir.2002) ("CAFRA transferred the burden of proof from the claimant to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard").

■ This standard of proof requires that the government show that it is more likely than not that the property is subject to forfeiture. See *United States v. Lawrence*, 189 F.3d 838, 844 (9th Cir.1999). Where the government's theory of forfeiture is that the property was used to commit or to facilitate the commission of a criminal offense, or that it was involved in the commission of a criminal offense, the government must establish that there is a substantial connection between the property and the criminal offense. 18 U.S.C. § 983(c)(3). See generally *United States v. 6250 Ledge Road*, 943 F.2d 721, 725 (7th Cir.1991) (noting that, under § 881(a)(7), the government need "only demonstrate that the nexus [between the property and the drug offense] is more than incidental or fortuitous," cited with approval in *United States v. 6380 Little Canyon Road*, 59 F.3d 974, 985 n. 11 (9th Cir.1995), abrogation on other grounds recognized by *United States v. $273,969.04 U.S. Currency*, 164 F.3d 462, 466 n. 3 (9th Cir.1999)).

### C. The Innocent Owner Defense

CAFRA "sets forth the procedures used in all civil forfeitures under federal law unless the particular forfeiture statute is specifically exempted in 18 U.S.C. § 983(i)(2). Section 983(d)(1) provides the following innocent owner defense to a civil forfeiture: 'An innocent owner's interest in property shall not be forfeited under any civil forfeiture statute. The claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.' " See also *United States v. 144,774 Pounds of Blue King Crab*, 410 F.3d 1131, 1134 (9th Cir.2005) (citing 18 U.S.C. § 983(d)(1)); *United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 n. 2 (9th Cir.2002) (CAFRA ... made a number of other remedial

reforms, including establishing a comprehensive " 'innocent owner' defense," citing 18 U.S.C. § 983(d)).

■ "An innocent owner defense requires proof, by a preponderance of the evidence, that a party '(i) did not know of the conduct giving rise to forfeiture; or (ii) upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property.' " *United States v. DAS Corp.*, Nos. 09–56645, 09–56792, 406 Fed.Appx. 154, 158, 2010 WL 5189226, *2 (9th Cir. Dec. 15, 2010) (Unpub. Disp.) (citing 18 U.S.C. § 983(d)(2)(A)); *United States v. Real Property Located at 3846 Nisenan Lane,* No. CIV. 06–1383 WBS DAD, 2009 WL 2777178, *4 (E.D.Cal. Aug. 28, 2009) ("An 'innocent owner' is one who either 'did not know of the conduct giving rise to forfeiture,' or, upon learning of the conduct, 'did all that reasonably could be expected under the circumstances to terminate such use of the property,' " citing 18 U.S.C. § 983(d)(2)(A)); *United States v. Section 18,* 976 F.2d 515, 520 (9th Cir.1992) (holding, prior to CAFRA, that "no property is forfeited [under § 881(a)(7) ] if the owner was without knowledge of the criminal activity or did not consent").

"Evidence of an owner's reasonable steps to terminate the illegal use may include notifying law enforcement authorities, revoking permission to use the property for those engaging in the illegal conduct, or other reasonable actions to prevent or discourage the illegal use."

*Real Property Located at 3846 Nisenan Lane,* 2009 WL 2777178 at *4 (citing 18 U.S.C. § 983(d)(2)(B)(i) ("For the purposes of this paragraph, ways in which a person may show that such person did all that reasonably could be expected may include demonstrating that such person, to the extent permitted by law (I) gave timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred; and (II) in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property")).

■ A claimant bears the burden of proof on an "innocent owner" defense. *Id.* (citing § 983(d)(1)); see also *United States v. $223,178.00 in Bank Account Funds,* No. SACV06–444 DOC (MLGx), 2008 WL 4735884, *5 (C.D.Cal. Apr. 30, 2008) ("Under the innocent owner defense, '[t]he claimant shall have the burden of proving that the claimant is an innocent owner by a preponderance of the evidence.' This burden is satisfied where a claimant shows either that the owner 'did not know of the conduct giving rise to forfeiture' or 'upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate use of the property,' " citing 18 U.S.C. § 983(d)(1)(i)-(ii)).[74]

**74.** Prior to the enactment of CAFRA, "circuits [we]re split as to whether the [innocent owner defense] require[d] an innocent owner to prove both a lack of knowledge and a lack of consent, or either a lack of knowledge or a lack of consent." *United States v. 16328 South 43rd East Ave., Bixby, Tulsa County, Okla.,* 275 F.3d 1281, 1284 (10th Cir.2002). Compare *United States v. One Single Family Residence Located at 6960 Miraflores Ave.,* 995 F.2d 1558, 1561 (11th Cir.1993) (adopting the conjunctive approach) with *United States v. 141st St. Corp.,* 911 F.2d 870, 877–78 (2d Cir.1990) (adopting the disjunctive approach). CAFRA codified the disjunctive approach, and requires the innocent owner to prove either a lack of knowledge or a lack of consent. See *16328 South 43rd East Ave., Bixby, Tulsa County, Okla.,* 275 F.3d at 1284 n. 1 (citing 18 U.S.C. § 983(d)(2)(A)).

### D. Whether the Defendant Property is Subject to Forfeiture

Griffiths concedes that use of the property violated federal drug laws;[75] the only question is whether he has adduced sufficient evidence of innocent ownership to defeat plaintiff's motion for summary judgment. Plaintiff contends it is entitled to summary judgment because it has adduced "overwhelming" evidence that Griffiths knew of the illegal use of the defendant property and failed to take all reasonable steps to prevent that unlawful use.[76] See

*United States v. One Parcel of Property Located at 15 Black Ledge Drive,* 897 F.2d 97, 102 (2d Cir.1990) (summary judgment in favor of the government was appropriate where there was "overwhelming" and "one-sided" evidence, citing *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505).

Plaintiff cites the following facts that it contends warrant the entry of summary judgment in its favor: (1) the maturity of the marijuana plants under cultivation at the time of the seizure shows that they had been growing for at least four months;[77]

---

**75.** Opposition at 10. There are no triable issues of fact as to whether the defendant property is subject to forfeiture; the government has met its burden of showing a "substantial connection" between the defendant property and illegal marijuana cultivation. 18 U.S.C. § 983(c)(3). See Panza Decl., ¶¶ 5–6, 9 (stating that detectives seized approximately 202 mature marijuana plants from the outdoor marijuana cultivation area, and found an indoor marijuana greenhouse in an upstairs bedroom. In addition, the following items were seized from in and around the primary residence: (1) outside the residence, an alarm wire from the outdoor grow that led to the house; (2) in the living room in front of the fireplace, a television monitor that allegedly displayed the outdoor grow; (3) inside a cabinet in the living room next to the front door, a clear plastic bag containing approximately eighteen grams of processed marijuana; (4) on Griffiths' desk in his bedroom, a box of documents labeled with "John Griffiths", which included two receipts from Foothill Hydroponics, a retailer of equipment and chemicals used for indoor plant growth; (5) in Griffiths' bedroom, $400 in U.S. currency in a briefcase and $1,000 in U.S. currency inside a floor safe; (6) six electrical ballasts, used to balance electrical fuses and make grow lights last longer; (7) in the grow room, high energy lamps with several high wattage bulbs, used to help marijuana grow; (8) on the hallway floor between Griffiths' bedroom and the marijuana grow room, a carbon dioxide generator, used to oxygenate plants in an indoor grow; (9) in the indoor grow room, two electrical cycle timers that automatically turned on the lights and ventilation system; and (10) in the primary residence, two shotguns, six rifles, and three handguns). See also *Real Property Located at 3846 Nisenan*

*Lane,* 2009 WL 2777178 at *3 ("With regard to the required connection between the defendant property and the underlying offense, the evidence shows that a considerable amount of live marijuana plants (465) and processed marijuana (524 pounds), in addition to other indicia of drug sales, was seized from the defendant property.... This undisputed evidence establishes a substantial connection between the property and the underlying drug offense," citing *United States v. 6 Fox Street,* 480 F.3d 38, 43 (1st Cir.2007) (holding that the seizure of twenty seven-pound bricks of marijuana from a parcel of real property "offers ample proof that the connection between the property and drug trafficking was indeed substantial")); *United States v. 4338 Snyder Lane,* No. 03–2245, 2004 WL 1811152, *2 (N.D.Cal. Aug. 12, 2004) (evidence of active marijuana cultivation and marijuana packaged for sale established a substantial connection between real property and a drug offense); cf. *United States v. 3234 Washington Ave.,* 480 F.3d 841, 846 (8th Cir.2007) (holding that the seizure of "a small quantity" (0.75 grams) of methamphetamine was insufficient to establish a substantial connection).

**76.** Motion at 7.

**77.** Bryson Decl., ¶ 4. Joseph F. Bryson, a United States Drug Enforcement Administration Special Agent, offers the opinion on which plaintiff relies. Rule 702 governs the admissibility of expert testimony. Under Rule 702,

"[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an ex-

(2) Griffiths was present at the defendant

pert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." FED.R.EVID. 702.

See also *United States v. Finley*, 301 F.3d 1000, 1007 (9th Cir.2002) ("[Rule 702] consists of three distinct but related requirements: (1) the subject matter at issue must be beyond the common knowledge of the average layman; (2) the witness must have sufficient expertise; and (3) the state of the pertinent art or scientific knowledge permits the assertion of a reasonable opinion"); *Sterner v. U.S. Drug Enforcement Agency*, 467 F.Supp.2d 1017, 1033 (S.D.Cal.2006) ("There are three basic requirements that must be met before expert testimony can be admitted. First, the evidence must be useful to a finder of fact. Second, the expert witness must be qualified to provide this testimony. Third, the proposed evidence must be reliable or trustworthy" (citations omitted)).

Before admitting expert testimony, the trial court must make "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–93, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). In conducting this preliminary assessment, the trial court is vested with broad discretion. See, e.g., *General Elec. Co. v. Joiner*, 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *United States v. Espinosa*, 827 F.2d 604, 611 (9th Cir.1987) ("The decision to admit expert testimony is committed to the discretion of the district court and will not be disturbed unless manifestly erroneous").

"The party offering the expert bears the burden of establishing that Rule 702 is satisfied." *Sundance Image Tech., Inc. v. Cone Editions Press, Ltd.*, No. CV 02–2258 JM (AJB), 2007 WL 935703, *4 (S.D.Cal. Mar. 7, 2007) (citing *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1306 (11th Cir.1999), in turn citing *Daubert*, 509 U.S. at 592 n. 10, 113 S.Ct. 2786); see also *Walker v. Contra Costa County*, No. C 03–3723 TEH, 2006 WL 3371438, *1 (N.D.Cal. Nov. 21, 2006) (same, citing *Bourjaily v. United States*, 483 U.S. 171,

172, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987), and *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 744 (3d Cir.1994)). This showing must be by a preponderance of the evidence. See *Daubert*, 509 U.S. at 594 n. 10, 113 S.Ct. 2786 (citing *Bourjaily*, 483 U.S. at 175–76, 107 S.Ct. 2775). "In determining whether expert testimony is admissible under Rule 702, the district court must keep in mind Rule 702's broad parameters of reliability, relevancy, and assistance to the trier of fact." *Sementilli v. Trinidad Corp.*, 155 F.3d 1130, 1134 (9th Cir.1998) (internal quotation marks omitted); see also *Jinro Am. Inc. v. Secure Invests., Inc.*, 266 F.3d 993, 1004 (9th Cir.2001) ("Rule 702 is applied consistent with the 'liberal thrust' of the Federal Rules and their general approach of relaxing the traditional barriers to opinion testimony" (internal quotation marks omitted)).

Bryson has been employed by the Drug Enforcement Administration for approximately eight years, and has completed more than 1,000 hours of training specifically related to marijuana enforcement, including marijuana identification, cultivation techniques, and pharmacology. (Bryson Decl., ¶ 1.) The training courses have been conducted by law enforcement experts, botanists, medical doctors, administrators of research programs, and other recognized experts in field. (*Id.*) In addition, Bryson has interviewed more than fifty people who have been arrested for marijuana offenses, and has read numerous books, periodicals, and research articles regarding marijuana use and cultivation. (*Id.*) Since 2003, Bryson has served as the Los Angeles Field Division Coordinator for the Drug Enforcement Administration's Domestic Cannabis Eradication/Suppression Program. (*Id.*, ¶ 2.) In this role, he has investigated, assisted with, or provided advice regarding more than one hundred indoor marijuana cultivation operations, medical marijuana dispensary operations, and outdoor marijuana cultivation operations. (*Id.*, ¶ 3.) He has instructed more than five hundred law enforcement officers and managers regarding such topics as investigation of indoor and outdoor cultivation, and of medical marijuana. (*Id.*)

Griffiths does not object to Bryson's testimony. Given his considerable experience in the field, the court is satisfied that Bryson's declaration meets the requirements of Rule 702. It will therefore consider Bryson's opinion in deciding the instant motion.

property for substantial amounts of time during the four month period, including the entire month of July 2005; [78] (3) agents found two receipts in Griffiths' name from a hydroponics vendor on Griffiths' desk, in his bedroom, reflecting the purchase of sulfur, a carbon dioxide filter, and a flange, items commonly used in growing marijuana and used in marijuana cultivation at the defendant property; [79] electrical bills for the defendant property were unusually high; [80] electrical ballasts and a carbon dioxide generator—items that aid the growth of marijuana plants—were found in the hallway directly outside Griffiths' bedroom; [81] and Griffiths recognized that his son was using lights and equipment to grow plants in his room. [82]

In support of its argument, plaintiff proffers the declaration and expert report of Joseph F. Bryson, a United States Drug Enforcement Administration Special Agent. [83] Bryson opines that, given the number and maturity of plants under cultivation at the time of seizure, the square footage devoted to cultivating marijuana, and the labor-intensive nature of marijuana cultivation, it would have been "impossible for any reasonable person to overlook." [84] He also asserts that a reasonable person in Griffiths' position would have noticed receipts for the purchase of highly unusual materials from a hydroponics vendor, given that such vendors commonly supply materials for marijuana cultivators. [85] Likewise, Bryson asserts, a reasonable person in Griffiths' position who received unusually high electric bills would have attempted to determine why the charges were so high. [86] Bryson maintains that, in combination, the high electric bills and receipts for purchases of hydroponic equipment associated with marijuana

---

78. *Id.*, Exh. H.

79. Panza Decl., ¶ 9.

80. *Id.*, ¶ 13.

81. *Id.*, ¶ 9.

82. Griffiths Depo. at 29:3–30–14 ("Q: And did you go into [Jonathan's room] in 2005? Before September 1, 2005? A: I did. Q: Did you see signs of marijuana being grown in that room? A: ... I came back [from a trip] and went into the room and noticed there was stuff growing there. I couldn't tell you whether it was marijuana or a fig tree. But there were plants growing in that room. And he had light fixtures up and stuff like that. And I said get it the hell out of there.... Q: And why did you tell Jonathan to get it out? A: Because it didn't belong there.... Q: Did you know that he was growing marijuana in that room? A: I did not know that, and I don't know that that was marijuana growing in there. I can guess. I can certainly guess. But did I know? No. Absolutely [not]").

83. The court discusses the admissibility of Bryson's testimony *supra*, note 78.

84. Bryson Decl., ¶ 4. Bryson bases his opinion, in part, on plaintiff's contention that Griffiths spent time outdoors cultivating apricots during the four months prior to the raid on the defendant property. Griffiths disputes this. (Griffiths Decl., ¶¶ 27–28.)

85. *Id.*

86. *Id.* Bryson phrases his opinion in terms of "Griffiths['] ... aware[ness] of the increase in electricity use at the property." (*Id.*) He cites the following testimony from Griffiths' deposition: "Q: Did you ever discuss—did you ever question why the electric bills were so high at the Live Oak residence? A: Question—the electric company? Q: Well, first of all, did you ever—was it ever an issue for you? Was it ever anything that you thought might be problematic? A: Yes. It was, actually. Before I bought the property, I asked the prior owner—actually, I asked the realtor to find out what the electric usage was for the place. I thought it would be good to know before I moved in. I didn't get the response back until after I already put the offer in to buy it. When I did get his usage, I was rather surprised how high it was. But I balanced it against there's no water bill and very little gas bills. That's just one of the things that came with the property...." (Griffiths Depo. at 28:1–18.) As can be seen, the testimony on which Bryson relies indicates that Griffiths received high electric bills at all times, not that Griffiths' electric bills increased.

growing would have caused a reasonable person to investigate whether there was illegal activity occurring at the property.[87]

Bryson also asserts that "unexplained" cash deposits of approximately $2,000 into Griffiths' account are consistent with transactions in controlled substances.[88] Finally, he notes that the plants Griffiths saw growing in Jonathan's bedroom were easily recognizable as marijuana, since untrained people—particularly someone like Griffiths who had smoked marijuana in the past—can identify marijuana plants relatively easily, and since there were growing lamps and a carbon dioxide generator, items typically generally associated with marijuana cultivation, in the room or its immediate vicinity.[89] Based on the foregoing factors, Bryson concludes that "there is no basis for Griffiths to claim that he did not recognize the nature of the activity taking place before him, and no explanation for his failure to take further steps to find out the true extent of that activity in terms of whether marijuana plants were being grown elsewhere on the property." [90]

### 1. Knowledge

"Because the innocent owner defense is an affirmative defense, it is not incumbent upon the government to prove that the owner had knowledge of the illegal activity. Rather, 'it is the claimant's responsibility to prove the absence of actual knowledge.'" *16328 South 43rd East Ave., Bixby, Tulsa County, Okla.*, 275 F.3d at 1284–85 (citing *United States v.*

*Four Million, Two Hundred Fifty–Five Thousand*, 762 F.2d 895, 907 (11th Cir. 1985)). The court is "not constrained to accept denials supported by a mere scintilla of evidence. Such bare denials—for example, where the defendant's alleged ignorance amounts to willful blindness, or where the owner's claims of ignorance are 'inconsistent with the uncontested facts'— are insufficient to create a genuine triable issue." *Id.* (citing *United States v. One Parcel of Prop., Located at 755 Forest Rd.*, 985 F.2d 70, 72–73 (2d Cir.1993)); *United States v. Parcel of Land & Residence at 5 Bell Rock Rd.*, 896 F.2d 605, 611 (1st Cir.1990) (a "merely colorable" affidavit is insufficient as a matter of law to avoid summary judgment).

■ As noted, plaintiff contends that evidence of Griffiths' knowledge of the marijuana cultivation operation underway at the defendant property is "overwhelming" and "one-sided." [91] Griffiths disputes this, asserting that he has raised triable issues of fact regarding knowledge.[92] It is undisputed, however, that, approximately two weeks before execution of the search warrant, Griffiths noticed that Jonathan was growing plants in the room in the primary residence where the indoor grow operation was subsequently found; that he saw the plants were surrounded by "light fixtures;" and that he told Jonathan to remove the plants because he believed they were marijuana.[93] Griffiths also admits he knew that Jonathan smoked marijuana and that

87. *Id.*

88. *Id.*

89. *Id.*

90. *Id.*

91. Motion at 7.

92. Opposition at 12. Griffiths' opposition is not paginated, so the court uses the pagination provided by the electronic docket.

93. Griffiths Depo. at 29:3–30–14 ("Q: And did you go into [Jonathan's room] in 2005? Before September 1, 2005? A: I did. Q: Did you see signs of marijuana being grown in that room? A: ... I came back [from a trip] and went into the room and noticed there was stuff growing there. I couldn't tell you whether it was marijuana or a fig tree. But there were plants growing in that room. And he had light fixtures up and stuff like that. And I said get it the hell out of there ... Q: And why did you tell Jonathan to get it

Jonathan had previously been convicted of importing a large quantity of marijuana into the United States from Canada.[94] Finally, Griffiths admits that, the day after his conversation with Jonathan, he left on a trip to San Francisco, and that he checked Jonathan's bedroom upon his return and saw that some electrical "stuff still appeared to be out in the hallway on the floor." [95]

Griffiths' admissions alone show that there are no triable issues of fact regarding his knowledge of—or, at least, willful blindness to—Jonathan's unlawful use of the defendant property. Stated differently, Griffiths' "bare denials" of knowledge, to the extent clearly "inconsistent with uncontested facts," are insufficient to create genuine issues of fact. *16328 S. 43rd E. Ave., Bixby, Tulsa County, Okla.*, 275 F.3d at 1285 (affirming the entry of summary judgment in favor of the United States in a forfeiture case); *One Parcel of Prop., Located at 755 Forest Rd.*, 985 F.2d at 72–73 (affirming the entry of summary judgment in favor of the United States in a forfeiture case based on evidence establishing that the owner was willfully blind to drug activity on the property).[96] See *United States v.*

out? A: Because it didn't belong there.... Q: Did you know that he was growing marijuana in that room? A: I did not know that, and I don't know that that was marijuana growing in there. I can guess. I can certainly guess. But did I know? No. Absolutely [not]").

94. *Id.* at 33:13–34:11 ("Q: What do you know about your son being arrested in Idaho? A: He had been stopped coming across the border from Canada to the U.S. in Idaho with marijuana.... Q: Was your son convicted in connection with that arrest? A: I think that would be called a conviction. He had to do restitution.... Q: What did Jonathan tell you about what he was doing with the narcotics in Idaho at that time? A: They went up there on a trip with some guys and found out, gee, they can buy marijuana there cheaper I think was the deal. And he just bought lots of marijuana to bring back").

95. Griffiths Decl., ¶ 72.

96. The Ninth Circuit has yet to determine whether the willful blindness standard survived the enactment of CAFRA. Section 983(d)(3)(A), however, requires both a subjective and objectively reasonable belief that the property in dispute was not subject to forfeiture. See 18 U.S.C. 983(d)(3)(A) (stating that the innocent owner must show, by a preponderance of the evidence, that he "did not know and was reasonably without cause to believe" that the property was subject to forfeiture). Courts that have considered the question have found that this language leaves the willful blindness standard in place. See *United States v. 2003 Lamborghini Murcielago*,

No. 6:07–cv–726–Orl–19KRS, 2007 WL 4287674, *5 (M.D.Fla. Dec. 6, 2007) ("The Government next argues that King was not an 'innocent owner' because King either knew or had reason to know that the automobiles were subject to forfeiture at the time he gained an ownership interest. Section 983(d)(3)(A) requires both a subjective and objectively reasonable belief that the property in dispute was not subject to forfeiture. The claimant cannot rely on 'willful blindness' to support his lack of knowledge"); *United States v. $57,500.00 in U.S. Currency*, No. 03–60598–CIV, 2004 WL 3751472, *4 (S.D.Fla. Apr. 27, 2004) ("An 'innocent owner' who becomes aware of the conduct giving rise to forfeiture may retain ownership rights to the defendant property by giving timely notice to the appropriate law enforcement agency and making a 'good faith' attempt to revoke permission for those engaging in such conduct to use the property. The claimant's deliberate ignorance is equated with knowledge of illegal activity. Under the objective standard for willful blindness, the claimant is 'required to introduce evidence that ... [he] took precautions to make sure that' the defendant currency was not used to buy or sell narcotics," citing 18 U.S.C. § 983(d)(B)(i)(I) and (II)). See also *United States v. One 1988 Checolet 410 Turbo Prop Aircraft, Dominican Republic Registration Tail Number H1698CT*, 282 F.Supp.2d 1379, 1382–83 (S.D.Fla.2003) ("While the absence of the willful blindness language in § 983(d)(2)(A) seems to suggest that a pure actual knowledge test might apply, it is unlikely that this was the intent of Congress in enacting this provision. Elimination of the 'willful blindness' concept from the

*3814 NW Thurman Street, Portland, Or., A Tract of Real Property*, 164 F.3d 1191, 1196–97 (9th Cir.1999) ("The innocent owner defense does not apply, however, where the owner was willfully blind to false statements made in a loan application. Ladum admitted in her deposition that, upon signing the previously unsigned tax returns at closing, she noticed that these returns listed Meegan as the preparer and she knew that someone other than Meegan had prepared her tax returns for 1990, 1991, and 1992. Thus, the district court did not err in concluding that the uncontroverted evidence showed that Ladum was willfully blind to the falsity of the tax returns she submitted and signed in connection with the loan application" (citation omitted)); *United States v. Real Property 874 Gartel Drive, Walnut, Cal.*, 79 F.3d 918, 924 (9th Cir.1996) ("We reject the Beltrans' innocent owner defense to this claim because both Isidro and Josefina Beltran obviously knew about, or were willfully blind to, the false statements in the loan application," citing *United States v. 1980 Red Ferrari*, 827 F.2d 477, 480 (9th Cir.1987) (stating that a claimant cannot avoid knowledge of illegal activity by "sticking his head in the sand")); *United States v. One 1984 Lincoln Continental, CA License No. 2AHG081, VIN1MRBP98F3EY617464*, 976 F.2d 738, 1992 WL 232513, *2 (9th Cir. Sept. 22, 1992) (Unpub. Disp.) ("[T]he district court found that Miller knew that her son had 'a problem before about his car....' Thus, Miller failed to carry her burden with respect to her claim of innocent ownership because, as the district court found, she was willfully blind to her son's use of the vehicle in connection with narcotic activities" (citation omitted)). See also *Lorillard Tobacco Co., Inc. v. A & E Oil, Inc.*, 503 F.3d 588, 594 (7th Cir.2007) (citing *16328 S. 43rd E. Ave., Bixby, Tulsa County, Okla* and *One Parcel of Prop., Located at 755 Forest Rd.* in a Lanham Act case, noting that, while a party's state of mind is generally a question of fact, a summary judgment court need not "accept denials supported by a mere scintilla of evidence," as where the party's "alleged ignorance amounts to willful blindness, or where the owner's claims of ignorance are 'inconsistent with the uncontested facts,'" and holding that "defendants must do more than baldly deny the reasonable inferences and facts presented by [plaintiff]

'innocent owner' test would create incentives for employers and other property owners to cast a blind eye toward the criminal activities of those to whom they entrust their property, and would run contrary to the prevailing notion that an 'innocent owner' is charged with some duty of reasonable care in avoiding illicit uses of his property. In pre-CAFRA law, this was the driving logic behind the conclusion of multiple courts which incorporated the concept of 'willful blindness' into the definition of 'knowledge' in interpreting the 'innocent owner' of real property under § 881(a)(7), even though this section—unlike § 881(a)(4)(C)'s 'innocent owner' definition governing conveyances—did not specifically include 'willful blindness' as a factor for consideration in determining the presence of guilty 'knowledge.' This court presumes Congress was aware of the judiciary's efforts to bring consistency to the interpretation of the concept of 'knowledge' in defining who stands as 'innocent owner' in the civil forfeiture context, and intended to incorporate this view into CAFRA, which does not attempt to otherwise limit the concept of 'knowledge' in its now universal definition of an 'innocent owner'" (citations omitted)); *United States v. 2001 Honda Accord EX VIN # 1HGCG22561A035829*, 245 F.Supp.2d 602, 611 & n. 8 (M.D.Pa.2003) ("We note that the innocent owner defense under CAFRA does not have a provision for 'willful blindness.' Nevertheless, the Third Circuit concluded that under pre-CAFRA law, 'knowledge' includes a 'willful blindness' component.... Since the Third Circuit has not yet addressed what constitutes 'knowledge' under CAFRA, we will continue to apply the 'actual knowledge' test" [developed by the Third Circuit prior to CAFRA's enactment, including its willful blindness component] ).

to avoid the conclusion that they knowingly sold counterfeit cigarettes").

In this regard, the facts of this case are similar to those considered by the Second Circuit in *United States v. One Parcel of Property, Located at 755 Forest Road, Northford, Conn.*, 985 F.2d 70 (2d Cir. 1993). There, the district court granted summary judgment in favor of the government on a claim that a wife's residence was subject to forfeiture, despite the wife's submission of an affidavit stating that, although she knew of her husband's drug use, she was unaware of the presence of narcotics in the home and had requested that he not use or keep narcotics there. *Id.* at 72. The appellate court held that the wife's affidavit was "insufficient, as a matter of law, to establish the requisite lack of knowledge." *Id.* at 73. The court noted that the affidavit did "not contest the government's evidence that the drugs and drug paraphernalia were discovered throughout the bedroom she shared with her husband[—] ... on top of a dresser, in a jewelry box on the top of the dresser, in a dresser drawer, and on a closet floor, places to which she had easy and continual access." *Id.* The fact that these items were in plain view, the court concluded, "utterly belie[d]" the wife's professed "ignorance of drug activities in the bedroom" and at best, constituted " 'willful blindness' " to the activities going on in the house. *Id.* Given that the wife's claim of ignorance was "inconsistent with the uncontested facts," the court affirmed the district court's finding that " 'more detailed factual substance in support of her claim of ignorance' was required for the wife to meet her burden" of proof on an innocent owner defense. *Id.*

Here, as in *One Parcel of Property, Located at 755 Forest Road, Northford, Conn,* Griffiths does not dispute—indeed concedes—that he saw cultivation equipment and plants that he suspected were marijuana in a room across the hallway from his bedroom, and that he saw the equipment was still in the hallway when he returned from a trip. Similarly, he does not dispute that there were receipts in a box on his desk in his bedroom from Foothill Hydroponics, a retailer of equipment and chemicals used for indoor plant growth. While Jonathan asserts that the receipts were his,[97] and that he "has no reason to believe" his father ever saw them, tellingly Griffiths' declaration does not state that he was unaware of the receipts, that he lacked access to the desk, or that he did not use the desk in the manner his son claims—to pay household bills. Griffiths' admitted knowledge that there were plants he suspected to be marijuana growing in a room across the hallway from his bedroom, and that there were high wattage lights in the room to help the plants grow, coupled with undisputed evidence that there were receipts from a hydroponics retailer on his desk in his bedroom, to which he had ready and complete access, suffices, without more, to establish Griffiths' knowledge that the property was being used for illegal purposes.[98] Indeed, at the hearing on this motion,

97. Drawing all inferences in Griffiths' favor, the court accepts as true for purposes of this motion Jonathan's testimony that he generally uses the name "John," and that the hydroponics receipts found on Griffiths' desk belonged to Jonathan.

98. Griffiths has adduced evidence that places certain facts on which the government relies in dispute. For example, a reasonable juror could credit Griffiths' testimony that he "had no reason to check[ ] out what was going on with the renters in the modular house;" that he "never noticed a[ ] peculiar odor that would have alerted [him] to strange things growing"; and that, although he knew Jonathan had smoked marijuana for pain management, he did not know that Jonathan had smoked marijuana in the house. A reasonable juror could also find that Griffiths had provided a credible explanation for the cash deposits made during the relevant period—i.e., rental income for the modular home and income from the sale of refurbished cars—

Griffiths' counsel conceded that his client had actual knowledge of the unlawful use of the defendant property, and argued that the case turned on the second prong of the innocent owner defense—whether Griffiths had taken all steps reasonably necessary to terminate the property's unlawful use. This is the issue to which the court now turns.

## 2. All Steps Reasonably Necessary to Terminate the Illegal Usage

Since the court has concluded that there are no triable issues of fact regarding Griffiths' knowledge of illegal activity at the defendant property, it must consider whether, upon discovering the indoor growing operation in Jonathan's bedroom, Griffiths " 'did all that reasonably could [have] be[en] expected under the circumstances to terminate such use of the property.' " *DAS Corp.*, 406 Fed.Appx. at 158, 2010 WL 5189226 at *2 (citing 18 U.S.C. § 983(d)(2)(A)). To satisfy this requirement, the claimant must show that he took "all reasonable steps to prevent the illicit use of [the] premises once [he] acquire[d] knowledge of that use." *16328 South 43rd East Ave.*, 275 F.3d at 1285 (citing *United States v. Lot Numbered One (1) of the Lavaland Annex*, 256 F.3d 949, 953–54 (10th Cir.2001)); accord *Calero–Toledo v. Pearson Yacht Leasing Co.*, 416 U.S. 663, 680, 94 S.Ct. 2080, 40 L.Ed.2d 452 (1974)

(noting that it might be unconstitutional to force an uninvolved property owner to forfeit his property when the owner "had done all that reasonably could be expected to prevent the proscribed use of his property"); *United States v. $69,292. 00 in U.S. Currency*, 62 F.3d 1161, 1165 (9th Cir. 1995) (citing *Calero–Toledo*, 416 U.S. at 680, 94 S.Ct. 2080); *United States v. Property Identified as 1813 15th Street N. W., Washington D.C.*, 956 F.Supp. 1029, 1037 (D.D.C.1997) ("[T]o avoid summary judgment, the claimant must supply evidence to allow a reasonable juror to conclude that, under the circumstances, all reasonable steps were taken to curtail the illegal activity.... [E]vidence to prove *some* reasonable steps were taken is insufficient to preclude summary judgment" (emphasis original)).

It is undisputed that Griffiths told Jonathan to remove the plants from the room in the primary residence because he "guess[ed]" they were marijuana.[99] It is likewise undisputed that, the day after his conversation with Jonathan, Griffiths left for San Francisco; upon his return, he checked Jonathan's bedroom and found that the plants were gone, although he saw electrical "stuff [that remained] in the hallway on the floor."[100] Finally, it is undisputed that Griffiths took no further action in response to his discovery of plants he

and that he had adequately explained his failure to provide more specific answers at his deposition. Even if all these facts are accepted as true, however, they do not overcome Griffiths' admission that he knew there was marijuana growing in the upstairs room across from his bedroom. See *16328 South 43rd East Ave., Bixby, Tulsa County, Okla.*, 275 F.3d at 1285.

99. Griffiths Depo. at 29:3–30–14 ("Q: And did you go into [Jonathan's room] in 2005? Before September 1, 2005? A: I did. Q: Did you see signs of marijuana being grown in that room? A: ... I came back [from a trip] and went into the room and noticed

there was stuff growing there. I couldn't tell you whether it was marijuana or a fig tree. But there were plants growing in that room. And he had light fixtures up and stuff like that. And I said get it the hell out of there ... Q: And why did you tell Jonathan to get it out? A: Because it didn't belong there.... Q: Did you know that he was growing marijuana in that room? A: I did not know that, and I don't know that that was marijuana growing in there. I can guess. I can certainly guess. But did I know? No. Absolutely [not]").

100. Griffiths Decl., ¶ 72.

believed to be marijuana in the primary residence.

Plaintiff contends, as a matter of law, that Griffiths did not take all actions "that reasonably could [have] be[en] expected under the circumstances to terminate [illegal] use of the property."[101] Griffiths failed, for example, to inspect the defendant property to determine whether additional illegal activity was afoot, and failed to contact law enforcement.[102] *16328 South 43rd East Ave., Bixby, Tulsa County, Okla.,* 275 F.3d 1281, is instructive in this regard. There, "[p]olice conducted a raid on appellant Ozella Scott's real property on August 28, 1995. During the course of this raid, police caught Ms. Scott's son, Mark Scott, with five marijuana plants that he had pulled from the ground as he fled. They also found two plants still growing on the property. Police executed a search warrant and found 1.4 pounds of marijuana in a mobile home on the property, along with various firearms. Police also found two 'portable outbuildings' containing lights, insulation, and a total of 37 pots. Some of the pots contained remnants of marijuana plants." *Id.* at 1282. "Ms. Scott stated in her deposition that [her daughter-in-law] Laura Scott only made one statement regarding marijuana growth on the property, and that Laura Scott was inebriated and had been fighting with Mark Scott at the time of her statement. In response to her daughter-in-law's report that Mark Scott was growing drugs on the property, Ms. Scott drove around the property looking for drugs. She apparently did not investigate any of the buildings or the back of the property. She then informed her son that she hoped he was not growing drugs on the property

'because you know how I feel about it. I don't want it on my property and I don't even want you using it.' Ms. Scott further stated that she rarely visited the property and never went there during the summer." *Id.* at 1283. The court reasoned that "Ms. Scott did little to deter her son from growing drugs on her land. She killed one of the marijuana plants with weed killer, confiscated and disposed of the marijuana seeds she had found, and threatened her son with eventual eviction if he did not desist. However, these steps fall short of what any reasonable land owner would undertake given such knowledge of drug use and cultivation. For example, she could have given notice to appropriate law enforcement officials, and she could have evicted her son upon the information she received from her daughter-in-law. At the very least, Ms. Scott could have investigated the property more thoroughly to determine whether marijuana was in fact growing there. While we understand that Ms. Scott might have had difficulty investigating the property on her own, nothing prevented her from having some third party— such as the police—investigate the property for her." *Id.* at 1286. The court therefore concluded that Scott had failed to show she took all reasonable steps to prevent the illegal use of her property, and concluded that her innocent owner defense was insufficient as a matter of law. *Id.* at 1287.

Like Ms. Scott, Griffiths was periodically absent from the property.[103] Also like Ms. Scott, the only action Griffiths took upon discovering Jonathan's indoor growing operation was to direct him to remove the plants Griffiths had observed; Griffiths did not search the house[104] or sur-

---

101. Motion at 7; Reply at 2.

102. *Id.*

103. See Kortum, Decl., Exh. H.

104. At oral argument, Griffiths' counsel contended that Griffiths had searched the house after returning from San Francisco. The undisputed evidence is to the contrary. Griffiths testified that, upon his return, he checked

rounding land to determine whether there was other marijuana growing activity; nor did he ensure that the plants he observed in Jonathan's room were the entirety of the illegal activity taking place on the property. Griffiths did not conduct an inspection of the property or undertake any further inquiry despite the fact that he knew Jonathan had previously been convicted of importing "lots of marijuana" from Canada. Most importantly, Griffiths did not contact law enforcement authorities. For these reasons, the court concludes that Griffiths failed to take all reasonable steps to ensure that the property was not being used for illegal purposes. Plaintiff is therefore entitled to have summary judgment entered in its favor on Griffiths' innocent owner defense as a matter of law. See *Real Property Located at 3846 Nisenan Lane*, 2009 WL 2777178 at *5 ("Claimant's statements ... demonstrate that she did not take reasonable steps to terminate the illegal use of the defendant property despite her knowledge.

She stated that the marijuana had been on the property for approximately three months before the March 2006 and that she lived on the premises during that period. Nevertheless, she admitted that she did nothing during that time to report the presence of substantial quantities of marijuana to law enforcement.... Accordingly, in the absence of genuine issues of fact regarding claimant's ... failure to take reasonable steps to terminate [the illegal] use, the Government is entitled to summary judgment in its favor on the 'innocent owner' defense"); *United States v. One 1984 Lincoln Continental, CA License No. 2AHG081, VIN 1MRBP98F3EY617464*, 976 F.2d 738, *2 (9th Cir. Sept. 15, 1992) (Unpub. Disp.) ("[T]he district court found that Miller knew that her son had 'a problem before about his car' and did not take 'necessary steps' in order to prevent the use of her vehicle to transport controlled substances.... Thus, Miller failed to carry her burden with respect to her claim of innocent ownership").[105]

Jonathan's bedroom and found that the plants were gone, although he saw electrical "stuff [that remained] in the hallway on the floor." (Griffiths Decl., ¶ 72.) Griffiths identifies no further steps he undertook to assure that the defendant property was free from illicit activity; indeed, Griffiths did not state, either in his declaration or at his deposition, that he undertook a search of the house. Moreover, Griffiths' counsel suggested that the police's search of the house is evidence that there was no additional marijuana present. Again, the uncontroverted evidence is to the contrary; the detectives' search revealed a clear plastic bag containing approximately eighteen grams of processed marijuana inside a cabinet in the living room next to the front door. (Panza Decl., ¶ 9.) For these reasons, counsel's arguments are unavailing.

**105.** At oral argument, Griffiths' counsel argued that only the primary residence, and not the surrounding land, should be subject to forfeiture, since the undisputed evidence reveals that Griffiths had actual knowledge only of the indoor grow operation and triable issues remain as to whether he had actual

knowledge of the outdoor grow operation. Counsel conceded, however, that Griffiths' knowledge of the indoor grow operation gave rise to an affirmative duty to investigate and eradicate the unlawful activity. Although he argued that Griffiths had fulfilled this duty, the court has concluded that Griffiths did not take all steps reasonably necessary to terminate the unlawful use of the property.

It is undisputed that a significant portion of the defendant property was in fact used for the cultivation of marijuana; the court is aware of no legal authority supporting the proposition that it is proper to determine which portions of a property were used unlawfully and which were not, and to order forfeiture of less than the entire property based on such an analysis. Rather, § 881(a)(7) subjects "the whole" of any property used for illegal activity to forfeiture; this has been interpreted to mean the entire tract "legally described." See 21 U.S.C. § 881(a)(7) ("subject to forfeiture "[a]ll real property, including any right, title, and interest in the whole of any lot or tract of land ... which is used, or intended to be used, in any

## III. CONCLUSION

As there are no triable issues regarding Griffiths' innocent owner defense, plaintiff's motion for summary judgment is granted. The government is entitled judgment forfeiting the defendant property.

manner or part, to commit, or to facilitate the commission of" a drug offense is forfeitable"); *United States v. Santoro*, 866 F.2d 1538 (4th Cir.1989) (holding that two parcels of farm property bisected by a road and taxed separately were both subject to forfeiture, even though the illegal activity took place only on one of the parcels because the legal description of the property treated the whole of the land as one unitary tract that was held by one owner); see also *United States v. 5 S 351 Tuthill Road, Naperville, Ill.*, 233 F.3d 1017, 1020 (7th Cir.2000) ("stating that property subject to forfeiture was the property "legally described as 'Lots 14 and 15 in Block 3 of Arthur T. McIntosh Co.'s DuPage Farms,'" but explaining that forfeiture process was complicated by the fact that the defendant property consisted of two separate parcels with different permanent index numbers and different legal owners); *United States v. Spa-*

*hi*, 177 F.3d 748, 752–53 (9th Cir.1999) (holding that the government was not entitled to forfeiture of a parcel not included in the property's legal description under a "color of title" theory).

Nor is the court aware of legal authority supporting a partial or hybrid innocent owner defense that would permit it to find Griffiths failed to take all reasonable steps as to the house, but did not fail to take such steps as to the surrounding land. Indeed, *16328 South 43rd East Ave., Bixby, Tulsa County, Okla.* appears quite clearly to stand for the contrary proposition; there, the court held that the owner's duty to investigate extended to the entirety of her property, even to outbuildings that she rarely visited and that appear to have been difficult for her to access. The court therefore finds counsel's argument unpersuasive.